UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT

```
---------------------------------------------------------------
In re:                                )
                                      )
PUBLISHERS CONSORTIUM, INC.,          )     Case No. 02-31588 (ASD)
                                      )
              Debtor.                 )     Chapter 11
---------------------------------------------------------------
AMERICAN NATIONAL BANK & TRUST        )
COMPANY OF CHICAGO n/k/a JP Morgan    )
Chase Bank,                           )
                                      )
              Plaintiff,              )
                                      )
v.                                    )     Adv. Pro. No. 02-3048
                                      )
COMMON COURAGE PRESS, INC., et al.,   )
                                      )
              Defendants.             )
---------------------------------------------------------------
```

**MEMORANDUM OF DECISION
ON REMAND FROM DISTRICT COURT**

## I.  INTRODUCTION

On December 9, 2004, the United States District Court for the District of Connecticut

(Covello, J.) issued a Memorandum and Order in an appeal from rulings of this Court in the

above-captioned case and adversary proceeding.  That Memorandum and Order, *inter alia*,

remanded the proceedings back to this Court for a determination of the parties' priorities

in the subject property.  This Memorandum of Decision responds to the District Court's

remand.

## II.  FACTUAL BACKGROUND

For the purposes of remand this Court finds the following facts, not inconsistent with

those previously found by the District Court.

Publishers Consortium, Inc. (hereafter, the "Consortium" or "Debtor") was for many years a publisher and distributor of books.  As part of its business, the Consortium entered into distribution agreements with various publishing houses (hereafter, the "Publisher(s)").  Although each of those distribution agreements differed in minor respects, all contained essentially the same material terms and conditions, to wit:  each individual Publisher would consign books to the Consortium, and the Consortium would perform services customarily performed by a book distributor, including marketing, invoicing, shipping, customer service, collection of the receipts of sale, warehousing, and processing of returns.  The distribution agreements further provided that the books would remain the property of the individual Publishers until sold to customers.

The Consortium's customers were typically large book retailers and wholesalers.  The Consortium would market and ship books to those customers, then collect the accounts receivable generated by those sales.  Under the distribution agreements the Consortium was independently obligated to remit the book sale price, less a commission and service costs, to individual Publishers regardless of whether, and when, it was paid by its customers.  Under a typical distribution agreement, payment from the Consortium to the Publisher was due 90 days after the "report date" – a scheduled day each month as of which the Consortium reported the total sales and the net amount due to each Publisher from the preceding month.

 None of the distribution agreements obligated the Consortium to segregate funds received in connection with sales of a particular Publisher's books, and the Consortium was not otherwise restricted in its use of those funds.  The individual Publishers had no direct contact with the Consortium's customers, and always logged their own accounts receivable

as due from the Consortium, rather than from any of the customers of the Consortium.

In 1999, American National Bank & Trust Company of Chicago n/k/a JP Morgan Chase Bank (hereafter, the "Bank") provided the Consortium with a revolving line of credit. In connection with that credit transaction the Consortium executed, and the Bank accepted, a *Loan and Security Agreement* dated January 13, 1999 (hereafter, the "Security Agreement"),[1] which granted the Bank a security interest in certain of the Consortium's property, including present and after-acquired accounts, contract rights, general intangibles, monies, reserves, deposits and deposit accounts.[2]

On August 29, 2001, through an *Agency Fulfillment Agreement* (hereafter, the

----

[1] Section 8.13 of the Security Agreement provides that it "shall be governed and controlled by the internal laws of the State of Illinois; and not the law of conflicts."

[2] Specifically, the Security Agreement provided, *inter alia*, that:

3.1 Borrower [the Consortium] grants to Bank a security interest in and to, the following Borrower's property, wherever located, whether now or hereafter existing, owned . . . , consigned (to the extent of Borrower's ownership therein), arising and/or acquired, including without limitation all of Borrower's . . . Accounts . . . contract rights . . . general intangibles . . . monies, reserves, deposits [and] deposit accounts . . . .

3.2 All of the aforesaid property and products and proceeds of the foregoing . . . are herein individually and collectively called the "Collateral". The terms used herein to identify the Collateral shall have the same meaning as are assigned to such terms as of the date hereof in the Illinois Uniform Commercial Code.

On January 20, 1999, the Bank filed a UCC-1 Financing Statement with the Illinois Secretary of State covering, *inter alia*, accounts, contract rights, general intangibles, monies, reserves, deposits and deposit accounts.

By a *Second Amendment to Loan and Security Agreement* dated February 7, 2001, the Consortium granted to the Bank a security interest in classes of property which largely overlapped the classes enumerated in the Security Agreement.

"Agency Agreement"), the Consortium subcontracted with Client Distribution Services, Inc. (hereafter, "CDS") to perform its book distribution operations beginning November 1, 2001. In that regard the Consortium delegated to CDS certain of its duties under the various distribution agreements, including its warehousing,[3] order receipt, order processing, shipping, invoicing, collection and book return processing obligations.  Under the Agency Agreement, the Consortium retained its obligation to market books, report sales, and remit funds to the individual Publishers.

The Consortium's President, David Wilk, testified that the Consortium entered into the Agency Agreement because CDS could perform various "back office" functions more efficiently than the Consortium.   The Publishers played no role in the Consortium's negotiations with CDS, and in fact most, if not all, of the Publishers knew nothing of that development until its execution was announced by the Consortium.  Gilbert Perlman, the president of CDS, testified that CDS was not equipped to administer relationships with small publishers such as were represented by the Consortium.  From and after November 1, 2001, the Publishers delivered their books directly to the CDS warehouse in Tennessee.[4]  CDS then invoiced those customers in its own name, collected payments, and placed those funds in its general operating account without segregation from other monies received.   The Agency Agreement required CDS to remit payment to the Consortium within 88 days of a monthly report date, thus allowing the Consortium two days

---

[3] The Consortium transferred all books located at its warehouse in Illinois to CDS's warehouse in Tennessee.

[4] CDS acknowledged that it, like the Consortium, received the books on consignment and that they remained the property of the Publishers until shipped to customers.

to pay timely those Publishers whose distribution agreements called for payment within 90 days of that same report date.  Further, as was the case before the advent of the Agency Agreement, the Consortium was obligated to pay the Publishers regardless of whether it had received payment from CDS.

On or before January 22, 2002, the Consortium fell into default of its obligations to the Bank.  On March 28, 2002, CDS wired the sum of $1,095,860.76 into the Consortium's deposit account at the Bank as payment for books sold in December 2001 (hereafter, the "December Sales Payment").  On the same day, the Bank exercised a set-off against the deposit account containing the December Sales Payment (hereafter, the "Set-Off").  Due to, *inter alia*, the fiscal impact of the Set-Off, the Consortium filed a petition in this Court on April 2, 2002 (hereafter, the "Petition Date"), seeking protection under Chapter 11 of the United States Bankruptcy Code.

On the Petition Date the Consortium owned accounts receivable due from CDS in connection with books sold in the months of January, February and March of 2002, and those accounts (hereafter, the "Pre-Bankruptcy Receivables") became part of its bankruptcy estate.  During the pendency of this bankruptcy case, but not later than July 1, 2002, the Consortium, as debtor-in-possession, received into a deposit account in the ordinary course of business, and pursuant to the terms of the Agency Agreement, the cash proceeds of the Pre-Bankruptcy Receivables (hereafter, the "January-March Sales Payments").  None of the January-March Sales Payments were interrupted, interdicted or impounded prior to their possession and commingling by the Consortium;[5] and some, or

---

[5] Over three months into this Chapter 11 case, it appears that the Consortium, the Bank and certain Publishers agreed to a segregation of funds *in the hands of the*

all, of the proceeds of those Payments were used or disbursed by the Consortium, as debtor-in-possession, pursuant to orders of this Court, including, without limitation, orders authorizing the use of cash collateral.

On April 26, 2002, the Bank commenced an adversary proceeding (Adv. Pro. No. 02-3048) against the Consortium and individual Publishers, seeking a declaratory judgment that the Consortium owned, and the Bank had a first priority lien in, the book inventory and/or accounts receivable that gave rise to payments from CDS to the Consortium (hereafter, the "Adversary Proceeding"). Certain of the Publishers answered and asserted counterclaims, arguing, *inter alia*, that as the owners of the books consigned to CDS and the Consortium, they had a right to the proceeds of sale. These Publishers also argued before this Court that they were entitled to the proceeds of the January-March Sales Payments as third-party beneficiaries of the Agency Agreement. These Publishers likewise objected to confirmation of the Debtor's proposed Chapter 11 plan on these bases, *inter alia*.

On August 7, 2002, this Court issued an order providing for a trial of the common issues presented by the Adversary Proceeding and the Debtor's proposed Chapter 11 plan – which depended for its confirmation upon the Consortium's ownership of, and the Bank's

---

*Consortium. See Fourth Preliminary Order Authorizing Interim Use of Cash Collateral* (Doc. I.D. No. 193) (hereafter, the "Fourth Cash Collateral Order") signed and entered on June 26, 2002. This order – prepared in the first instance by one or more of the parties in interest – provided, *inter alia*, that "75% of all funds held and received by the Debtor shall be segregated and maintained in a separate bank account at the [Bank] until further Order of this Court. The segregation of funds as set forth herein is based upon the request of certain Publishers and is not and shall not be deemed [sic] a determination of the rights of any party in the Debtor's accounts on [sic] the Proceeds thereof."

priority in, the proceeds of the January-March Sales Payments.  A multi-day trial ensued and, on November 20, 2002, this Court issued an oral ruling concluding that the Consortium was the owner of the January-March Sales Payments.  This Court further concluded that the Publishers were not third-party beneficiaries of the Agency Agreement, finding instead that "CDS did not intend to benefit the publishers by providing them with rights in the book proceeds through the . . . [Agency Agreement] or in any other manner" and that "there existed no facts capable of granting [the Publishers] third-party beneficiary status."  Accordingly, on November 26, 2002, this Court issued an order confirming the Debtor's Chapter 11 plan (Doc. I.D. No. 501), and on November 27, 2002, entered judgment in the Adversary Proceeding generally in favor of the Bank (Doc. I.D. No. 67) (hereafter, the "Bankruptcy Court Ruling").

A timely appeal (hereafter, the "Appeal") by certain of the Publishers (hereafter, the "Contesting Publishers") followed the Bankruptcy Court Ruling.  The subject of the Appeal was whether or not this Court erred in concluding (i) that the Consortium owned the accounts receivable, and proceeds thereof, arising from the sale of the Contesting Publishers' books; and (ii) that the Contesting Publishers were not third-party beneficiaries of the Agency Agreement.  In its appellate ruling (hereafter, the "District Court Ruling"), the District Court (Covello, J.) upheld this Court's finding that the Consortium owned the accounts receivable and proceeds arising from the sale of the Contesting Publishers' books, and that the Bank had properly exercised the Set-Off.  However, the District Court concluded, contrary to this Court, that the Contesting Publishers were indeed third-party beneficiaries of the Agency Agreement with *possible* priority over the interest of the Bank in the subject property, *i.e.* the January-March Sales Payments.  Accordingly, the District

Court (i) reversed this Court's confirmation of the Consortium's Chapter 11 plan; (ii) vacated this Court's judgment for the Bank in the Adversary Proceeding; and (iii) remanded with instructions to "reconsider the matter and the extent of the [B]ank's financial interest and each of the [P]ublisher-appellants' interests as third party beneficiaries of the Agency . . . Agreement . . . ."

### III.  DISCUSSION

The instant case and adversary proceeding present novel and analytically challenging issues.  In fact it might easily be said of this case what was written by Circuit Judge Cardamone in <u>Septembertide Publishing B.V. v. Stein and Day, Inc., et al.</u>, 884 F.2d 675, 676 (2d Cir. 1989) – a case implicating similar legal principles – that the Court is "required to resolve a difficult and close question involving third-party beneficiary and commercial law principles . . . ."

The specific issue presented on this remand is whether, with respect to funds arising from the sale of the Publishers' books and ultimately paid to the Consortium, but not then remitted to those Publishers (*e.g.,* the January-March Sales Payments), such Publishers' third-party beneficial rights, as recognized by the District Court, are subordinate to or superior to the Bank's security interest in the same property.  Of course, in answering this question the Court is constrained by certain determinations already made by Judge Covello in the District Court Ruling.  Accordingly, an examination of the legal contours of that Ruling is the logical starting point of the present analysis.

### A.  The District Court Ruling.

The analytical section of the District Court Ruling is divided into two subsections, titled as follows:  "1.  <u>Ownership – Accounts Receivable/Proceeds</u>" and "2.  <u>Third Party Beneficiary</u>".  The litigants here have confessed to some difficulty in reconciling these two subsections of the District Court Ruling.  One might argue – as have some of the parties – that Subsection 1 contains an analysis of *pre*-Petition Date rights and activity, and Subsection 2 addresses *post*-petition circumstances.  It might also be that Subsection 1

is concerned more generally with *title* to the subject property with respect to the efficacy of the Bank's setting off of funds already paid to the Consortium, while Subsection 2 deals with competing rights to funds not yet paid to the Consortium and/or in the control of the Bank.  This Court admits that it too may not fully appreciate the relationship between the two subsections *as intended by the District Court*.  Nonetheless, this Court believes that those subsections can be harmonized by reading the District Court Ruling to provide the following express and implied holdings:

1.  Although the subject books were provided by the Publishers *on consignment*, the Consortium had an exclusive ownership interest in the *funds* it received from CDS in connection with the sale of those books.[6]

2.   The Contesting Publishers are third-party beneficiaries of the Agency Agreement,[7] and their third-party rights in the subject funds are in conflict with the security interest of the Bank in those same funds.

3.  The rights of the Contesting Publishers to the subject funds, including their third-party beneficial rights, are defeated by the commingling of those funds in the hands of the Consortium.[8]

_____

[6]  District Court Ruling at 12 (". . . CDS wired $1,095,860.76 to the [C]onsortium as payment for books sold in December 2001.  These funds *then* became the property of the [C]onsortium." (emphasis supplied)).

[7] District Court Ruling at 16 (reversing and vacating this Court's Ruling rejecting a claim of third-party beneficiary status).  Notwithstanding the binding nature of the District Court Ruling, this Court continues to respectfully disagree with the District Court's conclusion regarding the third-party beneficial status of the Publishers.

[8] *See, e.g.,* District Court Ruling at 11-12.

4.  Thus, in order to realize upon their alleged superior interest in the subject funds, the Contesting Publishers must (a) interdict the flow of those funds before they reach the Consortium and are commingled, and (b) establish that their third-party rights in those funds are superior to the security interest of the Bank.

Accordingly, the issues raised by the twin requirements of holding "4", <u>above</u>, are the principal questions on remand.  This Court now turns to a more in-depth analysis of those critical questions.[9]

**B.  The Law of the Case - Commingling.**

The District Court Ruling is presently the law of the instant case and adversary proceeding.  It is clear from that Ruling that once funds subject to the rights or interests of a third party become irretrievably commingled by a debtor, the third party is relegated to

---

[9] The local law governing these questions is debatable, but thankfully, not an issue which this Court must definitively determine.  Certainly, in the absence of the Contesting Publishers' third-party rights, the efficacy of the Bank's security interest would be determined by the local law (UCC Article 9) of the State of Illinois (the Bank was an Illinois entity; the Consortium was an Illinois entity; and the Security Agreement (entered into in Illinois) provides that it is governed by the law of Illinois).  It is also apparent to the Court that Illinois conflicts law would respect the Agency Agreement's governing law stipulation to New York law, and thus, since the Contesting Publishers' third-party rights spring from the Agency Agreement, their legal characteristics arguably are measured by the local law of New York.  Unfortunately, the law governing the intersection and competition of these rights and interests is not nearly as self-evident.  Fortunately though, it is not necessary for this Court to determine finally that question because the issue at bar is largely determined on the basis of the law of this case, as announced in the District Court Ruling, and the wisdom and authority of *Septembertide*.  That decision – an interpretation of New York commercial and contract law – is equally persuasive with this Court even if Illinois law ultimately governs because  (i) this Court has great respect for opinions of the Second Circuit Court of Appeals, even if they are not technically controlling of a given situation; and (ii) there appears to be no authority in the Illinois statutes, or from courts of Illinois jurisdiction, which is contrary to, or inconsistent with, the relevant areas of New York law as announced by the Second Circuit in *Septembertide*.

the status of a "simple creditor".

It is equally clear that the District Court considered the December Sales Payment to fit this profile – *i.e.* with respect to that payment from CDS, the District Court stated that the Publishers "did not require the [C]onsortium to segregate the proceeds of sale from other funds held within the operating account . . . . With respect to these proceeds, then, the [P]ublishers became simple creditors of the [C]onsortium." District Court Ruling at 12.

Because the rights of "simple" creditors, *i.e.* general unsecured creditors, are subordinate to the interest of a secured creditor in its collateral, it is apparent that the District Court would have concluded that with respect to the December Sales Payment, the Publishers would lose out to the Bank *even in the absence of Bank's Set-Off rights.*[10] So the critical question is suggested: if the Publishers are "simple creditors", through commingling, with respect to the December Sales Payment, why then are they not likewise simple creditors – and thus subordinate to the Bank's interest – with respect to the January-March Sales Payments, which were similarly received by, and commingled in the hands of, the Consortium?[11]

---

[10] The efficacy of a bank creditor's right to set-off against a debtor's deposit account is not dependent upon the existence or perfection of a security interest in the funds in that account. Rather, this self-help remedy depends solely upon the bank's *control* of the subject deposit account and the *mutuality* of debts – *e.g.*, the debt owed by the Consortium to the Bank as lender, as against the obligation owed by the Bank to the Consortium as depositor. *See, e.g., In re The Bennett Funding Group, Inc.*, 146 F.3d 136, 139 (2d Cir. 1998).

[11] The segregation of funds established by the Fourth Cash Collateral Order acted only upon commingled funds after they were received by the Consortium. Further, given the timing of the initiation of that segregation, it appears that it would have affected, at most, the final (*i.e.* March) payment of the January-March Sales Payments.

-12-

The answer to this question does not appear to be found within the four corners of the District Court Ruling.  Perhaps, as suggested by more than one party here, the District Court failed to appreciate the fact that the only funds that remained in dispute – the January-March Sales Payments – had already been received by the Consortium in the identical manner as the December Sales Payment.  This explanation suggests that had the District Court appreciated the true status of the January-March Sales Payments, it would have concluded that as to those funds the Publishers are "simple creditors", and thus the Bank's security interest therein is superior to their rights.  This Court concurs with that inference and conclusion.  Accordingly, the law of the case compels judgment for the Bank in the Adversary Proceeding, and confirmation of the Debtor's pending Chapter 11 plan.

## C.  The Wisdom of *Septembertide* - First in Time, First in Right.

Assuming, contrary to the conclusion of the preceding subsection of this Memorandum of Decision, that the law of the case does *not* mandate a determination that the Bank has a superior interest in the January-March Sales Payments, this Court turns to an examination of the principles necessary to resolve the competition between a third-party beneficiary and the holder of a security interest in funds generated pursuant to a contract.   In this respect, the decision of the Second Circuit Court of Appeals in Septembertide – involving a similar competition – is persuasive and determinative of the case at bar.

In Septembertide, the firm of Stein & Day, a New York publishing house (hereafter, the "Hardcover Publisher"), and Septembertide Publishing, B.V. (hereafter, the "Author"), a corporation representing the interests of the author of a certain work of fiction (hereafter,

-13-

the "Work"), were parties to a  licensing agreement that provided the Hardcover Publisher

with, *inter alia*, exclusive licensing rights to publish a hardcover edition of the Work in

exchange for the payment of royalties.  In addition, the Hardcover Publisher was permitted

to sub-license its rights in the Work to a paperback publisher.  In consideration for the sub-

licensing rights, the Hardcover Publisher was obliged, *inter alia*, to pay the Author a two-

thirds share of its sub-licensing income.

Contemporaneous with the Hardcover Agreement, the Hardcover Publisher entered

into a sub-license contract (hereafter, the "Paperback Agreement") with New American

Library, giving it (hereafter, the "Paperback Publisher") the right to publish a paperback

edition of the Work.  In consideration therefor, the Paperback Publisher agreed to advance

to the Hardcover Publisher $750,000 in several installments, of which $364,500 remained

unpaid at the time of the subject dispute.  The Paperback Publisher, aware of conflicting

claims to these unpaid funds, deposited the same with the court rather than pay them

(hereafter, the "Impounded Funds") to the Hardcover Publisher.[12]

Approximately one year after the Hardcover and Paperback Agreements were

executed, the Hardcover Publisher arranged a credit facility with Bookcrafters U.S.A., Inc.

(hereafter, the "Lender").  To secure the obligation due under that facility, the parties

entered into a security agreement in which the Hardcover Publisher collaterally assigned

all its contract rights and accounts to the Lender, including the rights it had to receive sub-

license payments from the Paperback Publisher pursuant to the Paperback Agreement.

---

[12] Because the Impounded Funds were not placed in the hands of the promisee
(the Hardcover Publisher), where they might have been commingled, the decision in
*Septembertide* is not inconsistent with the law of this case as detailed in Section III.B. of
this Memorandum of Decision.

-14-

The Hardcover Publisher subsequently became insolvent and bankrupt, leaving both the Author and the Lender unpaid.  The resulting dispute concerned the competing rights and/or interests of those two parties in the Impounded Funds.  The Author claimed two-thirds of those Funds as a third-party beneficiary of the Paperback Agreement; whereas the Lender contended that it had a prior and superior right to those same Funds as proceeds of its security interest in the Hardcover Publisher's contract rights and accounts receivable, specifically including the rights and accounts flowing from the Paperback Agreement.

The parallel structure of <u>Septembertide</u> and the case at bar should be readily apparent.  The Consortium, like the Hardcover Publisher, is a debtor; CDS, like the Paperback Publisher, is the source, pursuant to contract, of the funds subject to dispute; and the Contesting Publishers and the Bank, like the Author and Lender, are the competing third-party beneficiaries and security interest holders, respectively.

<u>Septembertide</u> affirmed a district court's determination that the Author was an intended third-party beneficiary of the Paperback Agreement.  The Circuit Court also appears to have concluded that the Paperback Agreement's creation of third-party  rights in the Author was tantamount to an actual assignment of a portion of the Hardcover Publisher's contract rights in the Paperback Agreement.  In view of that deemed "assignment", the Circuit Court then concluded, in essence, that the debtor Hardcover Publisher could only have granted the Lender a security interest in one-third of its income under the Paperback Agreement because rights to the other two-thirds of those proceeds had been previously assigned to a third-party beneficiary – the Author – at the time of the making of the Paperback Agreement.  <u>Id.</u>, at 681-82.  This novel chain of holdings

(hereafter, the "Fundamental Holdings")[13] is what ultimately fuels the contentions of the

Contesting Publishers here.  Nonetheless, despite any initial or superficial appearance of

support, the decision in Septembertide is actually hostile to the Contesting Publishers' point

of view.  That is because what the Circuit Court found to be most salient, and ultimately

dispositive, was the *timing* of the acquisition of the competing parties' rights and interests.

In Septembertide the Circuit Court concluded that "[i]n resolving the question of

priority between a secured creditor and an intended third-party beneficiary whose interest

in the collateral preceded it, *a first in time, first in right rule applies.*"  Id., at 682 (emphasis

supplied).  While this holding is technically limited to Septembertide's unique facts, *i.e.*

---

[13] *Septembertide*'s Fundamental Holdings are novel in that they appear to
announce a significant leap in the nature of remedies afforded an intended third-party
beneficiary under New York law.  Traditionally, third-party beneficiary status was
thought to bestow upon the third party a simple, "procedural" remedy – *i.e. standing* to
bring a direct action against the promisor under the contract whose terms were
intended to benefit it.  In other words the beneficial status gave the third-party claimant
*general contract creditor rights* against the promisor despite a technical lack of privity.
*Septembertide* appears to expand that limited remedy somewhat dramatically by
holding that a third-party beneficiary not only enjoys an enforceable contract *claim*
against the promisor, but is also deemed to have an *interest* in specific property rights
of the debtor-promisee, *e.g.,* a deemed ownership interest in a promisee's contract
rights.

This Court notes that *Septembertide*'s Fundamental Holdings were stated
without reference or citation to pre-existing decisional authority, except for the ruling of
the district court below.  This Court has searched for precedent from other jurisdictions
supporting the substantive remedy announced in *Septembertide*, but has located
nothing akin to that principle.  This Court is not the first observer to note the novelty and
reach of *Septembertide*'s Fundamental Holdings.  *See* Orna S. Paglin, *How Secure is a
Secured Creditor? The Septembertide Case*, 113 Banking L.J. 784, 789-95 (1996).

Nonetheless, even under the novel remedial approach of *Septembertide* – a
case where the subject funds were *impounded* – it is far from clear that such doctrine
would be extended to a case in which the subject funds were not impounded, but
rather, received by the promisee, commingled, and ultimately disbursed to various
payees.

-16-

where the third-party rights "preceded" the interest of the secured creditor, this Court can think of no principled reason why the "first in time, first in right" rule would not also apply under the reverse scenario, *i.e.* where the acquisition of the third-party rights *followed* the granting of the security interest.  Otherwise, <u>Septembertide</u>'s first in time, first in right "rule" would not be a rule at all; it would be merely a *description* of the particular outcome when third-party rights precede a security interest.

The Contesting Publishers may well admit that their third-party rights were acquired after the execution of the Security Agreement – *i.e.* at the time of the making of the Agency Agreement – yet not concede that the Bank was "first in time" because, they might argue, the Bank's security interest in the Consortium's contract rights in the Agency Agreement was not enforceable until the existence of the Agency Agreement because its interest did not *attach* until the *making* of that Agreement.  <u>See generally</u>, UCC § 9-203 (2000).  At best though, such an argument would establish *simultaneous* attachment of the Bank and Contesting Publishers' respective interests in the subject property; it would not elevate the Contesting Publishers to "first in time" status.

Assuming *arguendo* that there was simultaneous attachment of the interests of the Bank and the Contesting Publishers, how should a court ultimately determine priority? Given the absence of direct authority on the simultaneous attachment of the interests of a secured creditor and the rights of a third-party beneficiary, this Court logically turns for guidance to the closely analogous competition between two secured creditors in the same item of collateral, *e.g.*, contract rights in a specific agreement.  Under that instructive paradigm it is interesting to note that if the subject contract was made at or after the

-17-

granting and perfection of the latter of the two security interests, then both creditors' security interests would *attach* at the same time, *i.e.* at the time of the making of the subject contract.  Yet despite such simultaneous attachment, it is black letter law that if Secured Creditor "A" possessed a valid and perfected security interest prior to Secured Creditor "B", then Secured Creditor "A" would be granted priority and allowed to satisfy fully its secured claim from the proceeds of the subject contract rights before Secured Creditor "B" would be entitled to any satisfaction from the same collateral.[14]  See generally, UCC § 9-322 (2000).  The key temporal principle is not *attachment*, but the *granting and perfection* of the respective interests.  In other words, in the case of the instant competition, an appropriate rule would accord priority to the *claimant which first dealt with the debtor with respect to the collateral*.  Accordingly, the Bank must be the prevailing party under Septembertide's first in time, first in right rule, even if its interest did not attach to the Consortium's contract rights in the Agency Agreement until the advent of that Agreement.

Other statements in the Septembertide opinion are directly supportive of the Bank's primacy.  For instance, the Circuit panel observed that "[i]t has always been the law in New York that an assignee stands in the shoes of its assignor and takes subject to those liabilities of its assignor *that were in existence prior to the assignment*."  Id. (emphasis supplied).  Applying this statement of law to the instant factual circumstances, it should be self-evident that the "assignee" here (the Bank) does *not* "take subject to" the "liabilities" of its "assignor" (the Consortium) because those liabilities (the Contesting Publishers' third-party rights) were not "in existence *prior to* the assignment [of the Security Agreement]."

---

[14] This statement excludes *marshalling* and any other equitable doctrine not implicated by the facts of the present case and proceeding.

-18-

(emphasis supplied).

A final observation by the Septembertide panel is instructive here, to wit: "It seems fair to require, as between a trade creditor and an author, that the creditor-assignee prudently ascertain the actual existence of its collateral before agreeing to take a security interest in it." 884 F.2d 682.  In Septembertide, "[a]n examination of the Hardcover Agreement, flagged by the Paperback Agreement, would quickly have revealed [the Author's third-party] interest . . . ."  Applying this principle to the instant case again confirms the wisdom of a rule that elevates the creditor which first dealt with the debtor with respect to the collateral.  If the assignee here (the Bank) had "prudently" sought to ascertain the existence and extent of its prospective collateral – *e.g.,* contract rights and accounts – it would not have discovered the Contesting Publishers' third-party rights in the Agency Agreement since that Agreement was not extant at that time.

In sum, an extension of the principles announced in Septembertide to the facts of the instant case and adversary proceeding compel this Court to accord priority to the interest of the Bank over that of the Contesting Publishers in the January-March Sales Payments.

## D.  Equitable Considerations.

The outcome impelled by Septembertide and the law of the case is strengthened and confirmed by an examination of principles of equity.  A ruling recognizing a superior property right in the Contesting Publishers would be a windfall for them, and effect an undue forfeiture upon the Bank, because the Contesting Publishers' acquisition of their superior interest would have occurred simply through the intervention of the Agency

-19-

Agreement, the making of which was unknown to them and for which they gave no value.

With respect to the proceeds from the sale of their books, the Publishers never bargained to be anything more than general unsecured creditors. At the time they entered into their distribution agreements with the Consortium, the Publishers' expectation and reliance was upon a state of affairs in which the Consortium's sales transactions with its customers were on an open account basis, which did not serve as a source of third-party beneficial rights. The only rights the Publishers had beyond those of general unsecured creditors of the Consortium were consignment rights entitling them to repossession of their unsold book inventory. However, once the book inventory was sold, the Publishers had no rights or interests in the resulting accounts receivable, cash proceeds, deposit accounts, etc., in which the Bank held a security interest.

Following the advent of the Agency Agreement, the Publishers still possessed consignment rights in their books; yet in addition, the Contesting Publishers claim, they also then enjoyed third-party beneficial rights in the "proceeds" resulting from the sale of their book inventory. These additional, putative rights were not bargained for by the Publishers, nor does the record suggest that they gave any value for them. In point of fact, most, if not all, of the Publishers were completely ignorant of the prospect and/or terms of the Agency Agreement until it was announced to them by the Consortium. Hence, any rights or interests acquired by them via the Agency Agreement can be fairly characterized as a windfall.

The flip-side of the Contesting Publishers' windfall is a forfeiture from the Bank. Prior to the creation of the Agency Agreement, the Bank acquired a property interest in, *inter alia*, all of the Consortium's existing and future contract rights and accounts. Thus,

the Bank bargained for and received its interest in future contracts, such as the Agency

Agreement, well before the time when the Contesting Publishers argue that they too

acquired an interest in the Agency Agreement.  Under those circumstances, a recognition

by this Court of superior rights in the Contesting Publishers would amount to a forfeiture

of the Bank's property.  Equity abhors a forfeiture.  E.g., Jones v. New York Guaranty &

Indemnity Co., 101 U.S. 622 (1879).  Accordingly, equity dictates that this Court recognize

and protect the superior interest of the Bank in the January-March Sales Payments.

## IV.  CONCLUSION

The law of this case and adversary proceeding, together with persuasive Second

Circuit authority, and ultimately confirmed by a consideration of principles of equity, compel

this Court to declare that the Bank has an interest in the subject property that is superior

to the third-party beneficial rights and/or interests of the Contesting Publishers.  A separate

order and judgment shall enter effectuating this declaration in the instant case and

adversary proceeding.

Dated: March 12, 2007                                    BY THE COURT



Albert S. Dabrowski
Chief United States Bankruptcy Judge